**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JILL M. WILLIS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **10 C 5926** |
| | ) | |
| **SEARS HOLDINGS MANAGEMENT** | ) | |
| **CORPORATION,** | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

After Sears Holding Management Corporation terminated plaintiff Jill Willis'

employment as Senior Counsel in its internal law department in connection with a reduction in

force, Ms. Willis sued Sears, contending that Sears' proffered reason – that she was the lowest

performing attorney in her group – was pretextual. According to Ms. Willis, her race, color, and

age led to her termination and caused Sears to deny her equal pay and promotions. Sears seeks

to exclude the testimony of Ronald E. Hall, Ph.D. pursuant to *Daubert v. Merrell Dow*

*Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny. For the following reasons, Sears'

motion is granted.

**I.      Background**

In 2005, Ms. Willis began her employment as an attorney in Sears' Law Department.

Her time with Sears ended when Sears terminated her employment on January 30, 2009. Sears

contends that this decision was part of a reduction in force because Ms. Willis was the lowest

performing attorney in her group. At the time of Ms. Willis' termination, the Law Department

was headed by William Harker, the then Senior Vice President and General Counsel for Sears

and an African American male. The decision to terminate Ms. Willis was made by Charles

Hansen, Vice President and Chief Counsel and a Caucasian male, with Mr. Harker's agreement and approval.

Ms. Willis posits that she was the victim of discrimination as she "was not the least senior in the department and her job duties were much in demand." Dkt. 84 (Response to Motion to Bar) at 2. Specifically, in her complaint, Ms. Willis alleges that she was terminated because of her race, color and age, was denied promotions and equal pay for the same reasons, and Sears retaliated against her for complaining about claimed discrimination. According to Ms. Willis, she was the victim of discrimination because she has darker skin than her African American colleagues at Sears, including Mr. Harker, and has a "Black ethnic appearance." *Id*. at 3

The expert report prepared by Dr. Hall is entitled "Intra-Racial Discrimination: Black on Black," measures a hefty 3/4 of an inch, and is 222 pages long. Dkt. 94. The original expert report did not specify the facts or data considered by Dr. Hall. At Sears' request, he submitted a supplemental disclosure that stated he had relied on "litigation documents reviewed: Complaint; Jill Willis Deposition; Bill Harker Deposition." Dkt. 81, Ex. A. He also referenced his original report, which contained references to professional materials he considered when preparing his report. Discovery in this case closed on March 21, 2012.

Dr. Hall describes himself as a "full professor of human behavior in the School of Social Work at Michigan State University." Dkt. 94 at 2. He has conducted "empirical investigations on the implications of skin color for human behavior and several nations abroad." *Id*. The seven-page "Purpose" section of the report discusses his view that "those of African descent, identified by their darker skin, were reduced in status from human to chattel. Subsequently,

America was and remains today in effect racist in culture, racist in values, racist in norms, racist in traditions, and unfortunately racist in law." *Id.* It also states that the purpose of the report is to analyze "victimism by means of black on black persons" in "an attempt to inform litigants about intra-racial discrimination and the implications of victim status for the conduct and continuation of discriminatory behaviors . . . . facilitate the judicial process and enable an emerging multiracial, multiethnic society to incorporate a new perspective that will accommodate recent shifts in the United States and other Western populations." *Id.* at 3-4. The "Purpose" section concludes with Dr. Hall's opinion that "[j]urisprudence for both the plaintiff and the defendant in the current case will necessitate the reference to history, theory, literature, entertainment, and skin-color litigation as a means to a just outcome." *Id.* at 7.

In Sears' motion to bar, it provided summaries of the opinions it believes that Dr. Hall expressed in his report. *See* Dkt. 80 at 3-5 (Memorandum in Support of Motion to Bar); Dkt. 90 at 6-7 (Reply in Support of Motion to Bar). Ms. Willis takes issue with Sears' difficulties in parsing out Dr. Hall's opinions and provides her own summary of Dr. Hall's opinions. The court will view the lengthy report, which largely does not directly address Ms. Willis' claims, through the lens provided by Ms. Willis' summary of Dr. Hall's opinions. In her response to the motion to bar, Ms. Willis states:

> There is a correlation between race discrimination and the concomitant stress and hypertension, (Defendant's Exhibit B. pp 39, 48-64)
>
> Defendant, specifically William Harker's negative feelings of not being "favorably impressed" by Plaintiff is caused by her non-Eurocentric appearance, including but not limited to her dark skin. (Defendant's Exhibit B. pp 39-40, 48-97)
>
> Workplace discrimination, including intra-racial color discrimination, prevails today (Defendant's Exhibit B. pp 42, 108- 132)

As a dark-skinned African American, Plaintiff was not only subjected to adverse treatment (discrimination) as a member of an assumed inferior race category [inter-racism] but is subjected to discrimination as a member of an assumed to be inferior, intra-racial, skin color category today (Defendant's Exhibit B. pp 42, 132-143)

Plaintiff did not fit the stereotype of dark skinned Blacks, *e.g.*, intellectually inferior and unproductive. Therefore, her superior credentials may have caused resentment by the less educated and experienced non-Blacks who were in higher positions than Plaintiff; her education and experience worked against her and she experienced Black on Black and White on Black discrimination, including lower pay, no promotion and termination. (Defendant's Exhibit B. pp 42-43, 143-151)

Sears' failure to promote and pay Plaintiff commensurate with her education and experience was intentional because she disproved the "Mulatto Hypothesis", *e.g.*, that light-skinned Blacks were more intelligent, industrious, etc. (Defendant's Exhibit B. pp 43-44, 151-188) Sears placed Plaintiff in a position far below what her credentials and experience warranted. And, Plaintiff was supervised by White males with considerably less education and experience.

White wom[e]n, also have a distinct history of discriminating against Blacks. And, White and Black males will favor White and fair skinned Black women over dark skinned women in the workplace (Kathy Waity-Fontanetta). (Defendant's Exhibit B. pp 44-45, 189-203) (Also See Bill Harker Deposition Excerpt Marked Exhibit B)

Dr. Hall applied the facts of this research data to formulate his opinions. Dr. Hall noted that William Harker was the General Counsel of Sears and that he was five years out of law school, while Plaintiff had 21 years of experience when she arrived at Sears and had superior credentials. Mr. Harker, is statistically Black, but is very fair skinned and not immediately identifiable as Black. The same can be said for the other "Black" attorney who has survived and advanced in the Sears law department and others who have worked there in the past. Plaintiff stuck out like the proverbial thumb.

Dkt. 84 at 5-7 (Response to Motion to Bar).

In addition, as Sears correctly notes, Dr. Hall has reviewed Mr. Harker's deposition

testimony. According to Dr. Hall, Mr. Harker is not a reliable witness, is biased or took

"unprecedented" actions with regard to Plaintiff's employment. Dkt. 94 at 45. He also criticizes

an unnamed female Sears employee who appears to be Kathy Waity-Fontanetta, a Caucasian

paralegal at Sears. Although the report's length prevents the court from reproducing it in full,

the following is an illustrative portion that addresses some of Mr. Harker and Ms. Waity-

Fontanetta's interactions with Ms. Willis:

> Among the critical operatives associated with the litigation brought by the plaintiff is one described as a light-skinned African-American male. After reviewing credentials, in my opinion he is impressive, but less impressive than the plaintiff. He is much younger in age and much less experienced as a trained litigant than the plaintiff. His [sic] is a graduate of the University of Pennsylvania School of Law, but otherwise enrolled at institutions of modest whereas the plaintiff, having more years of education, is a graduate of two Ivy league institutions and the alumnus of a prestigious undergraduate institution. That someone with lesser qualifications, such as the defendant operative, would assume supervision of someone more qualified, such as the plaintiff, appears to contradict the normal standards of prudent corporate management. Normally, prudent corporate management would not place personnel in positions of supervising workers whose academic credentials and years of experience exceed their own, without motivation. Not only is this cause for immediate conflict between worker and supervisor but this would deride the reputations and quality of work of all involved. I know Sears Holdings Management Corporation to employ very bright and skilled attorneys for the purpose of conducting its corporate affairs. However, defendant operatives have testified to being placed in positions at the company requiring "12 plus years of experience" while simultaneously admitting they had no such experience. Conversely, the plaintiff, having an excess of experience, was placed in a position that I believe was below her abilities, given her work history and educational background. Subsequently, I am convinced that the discrimination suffered by the plaintiff is not at all due to a lack of competence, but is, in fact, a contrived effort motivated by long-standing cultural traditions aimed at dark-skinned African Americans whose intellect and skills as per victimism are an affront to the mulatto hypothesis (V-9).

> Accusations of racism and sexism have been leveled consistently at white males. However, less acknowledged is the racism and sexism enacted by white women in both the past and present (V-10). Beginning with the Women of the Klu Klux Klan (WKKK) and following with the modern departure of black women from the feminist movement to create the womanist movement, working class white women in particular have sought to undermine the accomplishments of black women, thereby perpetuating victimism. Subsequently, one such defendant operative seems to have initiated a confrontation with the plaintiff by her refusal to give the plaintiff the respect normally due to a workplace superior. This

operative is not an attorney, but would venture, in my opinion, to assess the legal competence of a credentialed workplace superior, whose intellect and skill level is far greater.  In an effort to challenge someone, this person was presumptuous; in my opinion, this lesser-credentialed white female played an active and constant role intended to demean and undermine the defendant [plaintiff?], who is considered inferior by virtue of her race and skin color.  In concert with these efforts are the actions of a light-skinned African American male whose unspoken allegiance to the mulatto hypothesis is apparent.  According to his deposition, this light-skinned defendant operative and his working class female associate of the plaintiff were on quite amicable terms.  While he denies anything but a professional relationship, he acknowledges having gone to dinner and business trips with her.  The intimacy of their dinner and business travel arrangements make an apparent support system between this light-skinned African-American male and the white female, in an effort to undermine the dark-skinned plaintiff, who is superior in both credentials and experience.  In my opinion, the most dramatic display of this is the fact that the light-skinned black male would give validity to the opinions of a non-credentialed white female in assessing the legal competence of the black plaintiff, who is professionally superior overall.  Furthermore, I perceive as unprecedented that the defendant corporation would consider replacing a credentialed attorney with a non-credentialed person who is not an attorney.  Active discussion among defendant operatives then makes it apparent that a concerted effort existed to relieve the defendant [plaintiff?] of her position, which did not come as a surprise to past employees, as was told to the plaintiff.  This otherwise faulty maneuver is a contrived operation rooted in a historical dynamic known as the Bleaching Syndrome, between light-skinned blacks and their socially despised, dark-skin inferiors (V-11).  In my opinion, it is for this reason that a non-credentialed white female will consistently curry favor with a light-skinned black male in assessing a dark-skinned black female as less intelligent, and, as in this case, is professionally incompetent and inadequate to perform professional duties.

Dkt. 94 at 43-46.

Dr. Hall also opined that, "[i]n a nation founded on the principals of patriarchy, the plaintiff is further forced to contend with sexism extended from dictates of the U.S. Constitution, which originally favored 'white propertied males.'" *Id*. at 42.  In his view, the depositions of "defendants" (presumably Mr. Harker) show that the "operatives of the defendant who are trained in legal protocol appear well rehearsed as to how [he] should respond [at his

deposition] to bring about the desired corporate-friendly judicial outcome." *Id*. at 42. Similarly, Dr. Hall opines that to the extent that Mr. Harker stated during his deposition that he did not recall a fact, "[s]uch an absence of recall is noted via deposition as pertaining to race." *Id*. Dr, Hall concludes that this "illegal" discrimination "prevails today no less than it did in antebellum years." *Id*.

In the "Basis" section of his report, Dr. Hall includes a lengthy survey of the media's coverage of numerous events (arrests of African-Americans due to racial profiling, attacks on immigrant males in New York City, the Central Park Jogger, O.J. Simpson, various presidential elections, a 1990 murder in Boston, Susan Smith's drowning of her children, and traffic stops of a New Jersey dentist) to illustrate the "pervasive racism in America" and the "universal, almost mystic, belief in the power of skin color to elevate or taint." *Id*. at 48-57. He also discusses high blood pressure at length, *id*. at 57-64, contends that hypertension caused by racial discrimination is proportionate to the amount of melanin in the skin, and opines that "a dark-skinned attorney, such as the plaintiff, who is subjected to skin color discrimination in the workplace, would react accordingly." *Id*. at 59. In addition, Dr. Hall delves into Greek poetry (*id*. at 65-67), discusses the Breck Girl (*id*. at 68-70), skin-lightening beauty products (*id*. at 70-71), the impact of skin darkness on choosing Indian-Asian brides (*id*. at 72-73), sexuality (*id*. at 77-80), and slavery (*id*. at 79-85), revisits the Central Park Jogger (*id*. at 85-87), and expresses his opinions about politics in the late 1800s (*id*. at 185-188) and many other topics over the course of his 222-page submission.

## II.    Discussion

### A.    Standard of Review

Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court.  *See*

*Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006).  Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702.

In turn, under *Daubert*, this court must function as a "gatekeeper" to "ensure the

reliability and relevancy of expert testimony."  *Id*. at 607, *quoting Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 152 (1999).  To perform the gatekeeping function, the court must

focus on the expert's methodology, *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000),

and consider whether the expert's work is "reasoned, uses the methods of the discipline, and is

founded on data," *Naeem*, 444 F.3d at 608, *quoting Lang v. Kohl's Food Stores, Inc.*, 217 F.3d

919, 924 (7th Cir. 2000).  The court must also determine if an expert is offering legal

conclusions, as "experts cannot make those."  *See United States v. Diekhoff*, 535 F.3d 611, 619

(7th Cir. 2008).

### B.    Sears' Motion to Bar

Sears seeks to bar Dr. Hall's testimony, contending that Dr. Hall's review of the

depositions of Ms. Willis and Mr. Harkin and the professional materials listed in his report

shows that he is unqualified and that Ms. Willis cannot use her response to the motion to bar to

add additional materials allegedly considered by Dr. Hall when drafting his report. Sears also

argues that: (1) Dr. Hall is not qualified to opine that Ms. Willis was the victim of

discrimination, what constitutes "prudent corporate management" or hypertension; (2) no proper

basis supports Dr. Hall's opinions; (3) Dr. Hall's opinions will not aid the jury; (4) Dr. Hall is

attempting to offer improper legal conclusions. The court agrees with Sears across the board.

**1.      Disclosure of Additional Bases for Dr. Hall's Opinion**

After receiving Dr. Hall's report, Sears flagged the open question regarding the basis of

Dr. Hall's opinion for Ms. Willis, who responded with a supplemental disclosure after the close

of discovery stating that Dr. Hall had reviewed her deposition as well as Mr. Harker's deposition

when preparing his report. In her response to Sears' motion to bar, Ms. Willis states that, in

addition to the materials identified in her original and supplemental reports, Dr. Hall also

considered the depositions of Charles Hansen, David Chemeli, and Matthew Myren. Sears did

not object to the initial supplemental disclosure, even though it was made after the close of

discovery, but objects to the further disclosures in Ms. Willis' response to the motion to bar. In

response, Ms. Willis contends that Sears cannot be surprised by the additions as it "had every

opportunity to take Dr. Hall's deposition, but failed or refused to do so." Dkt. 84 at 7 (Response

to Motion to Bar).

As noted by Sears, the Federal Rule of Civil Procedure require a party to provide a

"complete statement of all opinions the witness will express and the basis and reasons for them"

and an itemization of "the facts or data considered by the witness in forming them." Fed. R. Civ.

Pro. 26(a)(2)(B)(I) & (ii). Discovery is closed and the rules do not give parties carte blanche to supplement an expert opinion at the time of their choosing. Instead, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) and (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless…." Fed. R. Civ. Pro. 37(c)(1). Thus, if a party fails to provide timely expert disclosures as required under Rule 26, exclusion of the untimely expert opinion is proper unless the party shows that its late disclosure was justified or harmless. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 2002).

Ms. Willis does not provide any explanation for the late disclosures so the court cannot find that her actions were justified. Moreover, it rejects her effort to blame Sears for her failure to comply with the rules. Sears was not required to depose Dr. Hall to find out information that Dr. Hall was required to provide in his report. The court will thus limit its consideration of Dr. Hall's opinions to the bases that were disclosed in a timely fashion. The court acknowledges that this ruling will not have any discernable impact on the resolution of the motion to bar as Dr. Hall's report largely consists of broad statements with occasional cites to academic materials. Moreover, Dr. Hall's references to the "defendants' operatives" makes it impossible to definitively ascertain which Sears employees are being discussed from the face of the report. Nevertheless, in the interests of completeness, the court believed it would be helpful to outline the materials that are properly before it. With this in mind, the court turns to Sears' substantive arguments about Dr. Hall's report.

2.      *Daubert*

As noted above, the court's analysis is guided by the Seventh Circuit's three-step

admissibility analysis for expert testimony under Rule 702 and *Daubert.  See Ervin v. Johnson &*

*Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007).  Specifically: (1) "the witness must be

qualified as an expert by knowledge, skill, experience, training, or education"; (2) "the expert's

reasoning or methodology underlying the testimony must be scientifically reliable"; and (3) the

expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact

in issue."   *Id*. (internal citations and quotations omitted).

Sears first notes that "[l]ittle of Dr. Hall's report actually relates to [Ms. Willis] and the

events surrounding her employment."  Dkt. 90 at 6  (Reply in Support of Motion to Bar).  The

court declines to ascribe the percentage of statements in the lengthy expert report that

specifically refer to Ms. Willis, but it clearly is low.  A federal discrimination trial is not a

college social science class where a professor may lecture at will about broad social issues.  This

means that most of the report is irrelevant.

Moreover, Ms. Willis' position that Dr. Hall can opine about whatever he wants as long

as Sears has the opportunity to depose him or hire a rebuttal expert is flatly incorrect.  As Ms.

Willis herself acknowledges, it is "obvious" that "Dr. Hall is not a medical doctor, lawyer,

human resource, personnel or corporate manager."  Dkt. 84 at 11 (Response to Motion to Bar).

His background as a social scientist neither qualifies him to opine about matters outside his field

nor transmogrify other areas of specialization into "social science."

For example, Dr. Hall posits that "prudent corporate management would not place

personnel in positions of supervising workers whose academic credentials and years of

experience exceed their own, without motivation." Dr. Hall's CV, however, does not show that

he is qualified to opine about what constitutes "prudent corporate management" within Sears'

legal department. Indeed, setting aside his lack of expertise in managing an in-house legal

department, he has no discernable basis to opine about Sears' legal needs in the past, present, or

future.

Moreover, the belief that placing an unspecified individual with fewer years in the

workplace and (at least in Dr. Hall's opinion) lesser academic credentials constitutes intra-racial

discrimination is problematic on many levels. Dr. Hall is not a lawyer and cannot provide legal

opinions. His opinion is also conclusory. Finally, it fails to take other factors into account that

affect hiring decisions, including the nature of the two employees' experience, its relevance to

the demands of a specific job, the employer's projected future needs, interview performance,

other competencies and skills, potential for growth, and salary expectations. Thus, this portion

of his report is clearly inadmissible.

Dr. Hall's opinion that Ms. Willis' high blood pressure demonstrates that she was the

victim of workplace discrimination is similarly improper. Parsing the report, Dr. Hall states that

African-Americans generally have a higher incidence of hypertension and that hypertension

caused by racial discrimination is proportionate to the amount of melanin in the skin. He then

opines that "a dark-skinned attorney, such as the plaintiff, who is subjected to skin color

discrimination in the workplace, would react accordingly." Dkt. 94 at 59. In her reply, Ms.

Willis clarifies that Dr. Hall believes that her hypertension was caused by discrimination at

Sears:

> . . . the correlation between discrimination, stress and hypertension in Blacks is,
> apparently, well documented. And, an expert need not actively conduct his own

> tests to have a valid methodology for *Daubert* purposes. *Phillips v. Raymond Corporation*, 364 F. Supp. 2d at 743. Contrary to Sears' assertion, Dr. Hall did not diagnose Plaintiff with hypertension. He provided scientific data to support his stated opinion that discrimination in the workplace and the concomitant stress is associated with hypertension in Blacks, among other causes, including diet, genetics and socioeconomic considerations. In Dr. Hall's opinion, Plaintiff's facts support her claim of discrimination and she has hypertension. Therefore, there could be a relationship. Dr. Hall is speaking as a social scientist, not a medical doctor. Once again, Sears had every opportunity to confront Dr. Hall at deposition and will have the opportunity at trial.

Dkt. 90 at 11 (Reply in Support of Motion to Bar).

Any argument that Dr. Hall should be allowed to testify that Ms. Willis' hypertension demonstrates that she was the victim of discrimination at Sears is frivolous. First, Dr. Hall concedes that there "could be a relationship" between Ms. Willis' claims and her hypertension. His opinion about the cause of Ms. Willis' hypertension is thus improper because it is speculative. *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 815 n.17 (N.D. Ill. 2005) ("Even where a witness is an expert in the relevant field, the evidentiary reliability demanded by *Daubert* is not present when his or her opinion is speculative or rests on an unsound basis").

Moreover, his belief that stress caused by workplace discrimination, diet, genetics, and "socioeconomic considerations" causes hypertension so Ms. Willis' hypertension must necessarily be completely or largely caused by workplace discrimination at Sears is not "based on sufficient facts or data, . . . the product of reliable principles and methods," or the result of a reliable application of his "principles and methods to the facts of the case." Fed. R. Evid. 702. Instead, "the only connection between [Dr. Hall's] studies and this specific case is [Dr. Hall's] say-so" which is insufficient under *Daubert*. *See Cooper v. City of Chicago Heights*, No. 09 C 3452, 2011 WL 2116394, at *5 (N.D. Ill. May 27, 2011), *citing Zenith Elec. Corp. v. WH–TV*

*Broadcasting Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) ("[e]xperts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert"). In short, Dr. Hall is not a doctor, has not reviewed any medical records and – most critically – lacks any foundation for opining that a specific medical condition is caused by workplace discrimination. Thus, he may not testify about his subjective beliefs regarding the source of Ms. Willis' hypertension.

The remainder of the parties' arguments can be disposed of quickly. The only proper subject that Dr. Hall is arguably qualified to address is intra-racial discrimination. While Sears denies that discrimination occurred, it does not appear to contest that intra-racial discrimination (as opposed to interracial discrimination) exists generally. Thus, there is no need for expert testimony to establish that intra-racial discrimination exists. This is especially true since Dr. Hall's extremely detailed opinions about the historical causes of intra-racial discrimination would be distracting and confusing.

Similarly, the jury must determine credibility based on its own observations of the witnesses. Dr. Hall may not testify about this subject by, for example, opining that he believes that Mr. Harker is an unreliable witness. *See Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (an "expert cannot testify as to credibility issues").

The fact that Dr. Hall looked at a very limited subset of materials relating to Ms. Willis' claims is also problematic. Based on these materials, Dr. Hall opined in conclusory terms that Ms. Willis was wronged in light of his views about intra-racial discrimination and what constitutes appropriate workplace interactions. This conclusion lacks scientific rigor and is not

-14-

based on any specific methodology. *See Ervin v. Johnson & Johnson, Inc.,* 492 F.3d at 904 ("the expert's reasoning or methodology underlying the testimony must be scientifically reliable"). The answer to this problem is not to tell Sears to cross-examine Dr. Hall to expose the weaknesses in his logic. It is to exclude his testimony. *See Tyus v. Urban Search Management,* 102 F.3d 256, 263 (7th Cir. 1997) (the "court must ensure that it is dealing with an expert, not just a hired gun").

In addition, Dr. Hall may not opine that Ms. Willis was the victim of race or sex discrimination as it is well-established that expert testimony about an ultimate legal conclusion is improper. *See, e.g., United States v. Sinclair,* 74 F.3d 753, 757, 758 n .1 (7th Cir. 1996). This kind of testimony would usurp the jury's role and is simply unnecessary in this employment discrimination case since the jury does not need "scientific, technical, or other specialized knowledge" to understand the evidence or determine a fact in issue. *See* Fed. R. Evid. 702. Instead, Ms. Willis will have to do what every other plaintiff in a discrimination case does: present her evidence to the jury so it can draw its own conclusions about what happened and why Sears acted as it did.

## III.    Conclusion

For the above reasons, Sears' motion to bar [79] is granted and Dr. Hall's testimony is excluded in its entirety. Any motions for leave to file a dispositive motion shall be noticed for

presentment on September 25, 2012. The parties may include a agreed proposed briefing

schedule in the motion. This matter is set for status on September 25, 2012, at 11:00 a.m.


DATE:   September 7, 2012

_____
Blanche M. Manning
United States District Judge