IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JILL M. WILLIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) No. 10 C 5926 |
| v. | ) |
| | ) Judge John A. Nordberg |
| SEARS HOLDINGS MANAGEMENT CORP., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

### Introduction

This is an employment discrimination case. Plaintiff Jill Willis worked at Sears as an in-house lawyer for three and a half years and was then laid off in 2009 as part of a company-wide reduction in force. She asserts claims under Title VII, Section 1981, the Age Discrimination in Employment Act, and the Equal Pay Act. Sears has filed a motion for summary judgment on all claims. For the reasons set forth below, the motion is granted.

### Facts

Willis is an African American female, born in 1952. (DF 2.)[1] She graduated from the University of Chicago Law School in 1984. (DF 3.) After working two years as an associate at a Chicago law firm, she was hired at Allstate Insurance Company as an in-house bond lawyer. (DF 2-3.)

In 2003, Willis left Allstate as part of a separation agreement resolving a charge of race discrimination she had filed against Allstate. (DF 5.) She had complained about not being promoted to the position of Officer. (Pl. Resp. to DF 5.) She then worked in her own law practice drafting contracts and other business documents for small businesses. (DF 5.)

---

[1]"DF" is Defendant's Local Rule 56.1 Statement of Material Facts.

-1-

In August 2005, at age 53, Willis was hired as an in-house attorney for Sears. (DF 6.) She was given the position of Senior Counsel, which is the second lowest position in the hierarchy of in-house positions. (DF 8.) Willis believed, based on her experience at Allstate and based on her education, that she should have been hired at the next higher level called Assistant General Counsel. (Pl. Aff. ¶ 12.) She was willing to take the Senior Counsel position, however, because the hiring attorney, Tim Hickey, allegedly stated that she would be promoted to Assistant General Counsel within a year when another attorney (Alice Buckley) left the company. (*Id.* at ¶ 10.)

When Willis was hired, the general counsel at Sears was Andrea Zopp, an African American woman. (DF 16.) In January 2006, William Harker, also an African American, took over as new general counsel, and he served as general counsel during the events in this case. (DF 37.)

In October 2007, Willis applied for a promotion to Associate General Counsel. (DF 40.) This job was two levels above her current position of Senior Counsel. (*Id.*) Eight other in-house attorneys applied for the position. (DF 43-44.) David Chameli received the promotion. (DF 45.) He had worked at Sears for a little under seven years and had been Assistant General Counsel for a little under two years. (DF 47.) Matthew Myren, who provided input for the decision, testified that Chameli was the candidate who could best balance the substantive work while effectively managing a team. (DF 46.) Willis believes that she was more qualified than Chameli because her contract drafting skills were better. (Pl. Resp. to DF 46.)

In June 2008, Willis again sought a promotion, this time for the position of Assistant General Counsel. The position was given to Ursula Petrozzi. (DF 48.) According to Sears, Petrozzi was more qualified because she had higher performance ratings for 2005, 2006, and 2007. (DF 51-52.) Willis believes she was more qualified than Petrozzi based on Willis' years of drafting experience. (Pl. Resp. to DF 51.)

In January 2008, Sears hired Charles Hansen, a Caucasian male born in 1947, as Vice President and Chief Counsel. (DF 67.) Hansen took time to meet the attorneys he would be supervising. Willis states in her affidavit that she and Hansen "had a good and respectful relationship." (Pl. Aff. ¶ 31.)

In January 2009, Harker told Hansen that Sears was implementing a reduction in force and that Hansen needed to lay off the lowest performer on his team. (DF 68.) Hansen concluded that Willis was the lowest performer. (DF 70.) On January 30, 2009, he notified her in person that she was being let go as part of this company-wide reduction in force. (Pl. Aff. ¶ 32.)

On May 29, 2009, Willis filed an EEOC charge alleging that Sears discriminated against her on the basis of race, color, age, and sex. (DF 74.)

In June 2009, Willis was hired as Assistant General Counsel by U.S. Foodservice. (DF 75.) One of U.S. Foodservice's customers is Sears. (DF 76.) In August 2009, Willis negotiated

a supplier agreement for U.S. Foodservice with a lawyer at Sears named William McCormick. Willis never told McCormick during these negotiations that she had filed an EEOC charge against Sears. (DF 77.)

On October 23, 2009, U.S. Foodservice terminated Willis' employment, explaining that she was not a good fit. (DF 79.) Willis states that U.S. Foodservice never reviewed her or gave her any negative feedback regarding her performance before terminating her. (Pl. Resp. to DF 79.) Willis also states that her termination occurred just after her negotiation with attorney McCormick and also just after Harker had viewed her professional work profile on a public employment networking site. (Pl. Aff. ¶ 34.) Willis believes that Sears secretly contacted U.S. Food Service, a vendor of Sears, and poisoned her reputation there leading to her firing, all because Sears was retaliating against her for filing the EEOC charge. (Pl. Resp. at 4.)

## Analysis

Willis alleges that Sears discriminated against her based on her race, color, sex, and age. She asserted a number of claims in her complaint. Sears in its opening brief provided arguments as to why summary judgment should be granted on all the claims. In her response brief, plaintiff focused only on two of her claims and ignored the rest. The first claim is her discrimination claim relating to the 2009 decision to lay her off. The second is her Equal Pay Act claim that she was paid less than similarly situated men.

We begin with the first claim. Both parties agree that the key issue is pretext. A pretextual explanation is "a lie, specifically a phony reason for some action," which is designed to cover up the discriminatory motive. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008). At issue is the adequacy of Sears' explanation that plaintiff was laid off because she was the lowest performing attorney in the group. According to Sears, this decision was made by Charles Hansen who chose Willis based on (i) his direct observation of her work and (ii) the fact that she had "consistently average and non-improving performance ratings" for three years. (Def. Mem. at 11; DF 69-70.)

Willis paints a different picture. She believes that the primary discriminator was William Harker, the general counsel. Although Harker is African American, Willis believes that he has a bias against African Americans who, like Willis, are "black skinned" and "afro centric in appearance." (Pl. Resp. 7.) Willis' theory is that Harker pressured Hansen who reluctantly fired her despite believing that she was a very good lawyer. Willis also alleges that Harker manipulated her performance ratings by using a process known as "calibration."

Before addressing these specific arguments, we first address two general assertions Willis makes throughout her response brief. First, she emphasizes her education (including her undergraduate degree) and her experience as in-house counsel for Allstate. For example, she states in the opening paragraph of her response brief: "Plaintiff, Jill M. Willis [] was a Wellesley College, Columbia University and University of Chicago Law School graduate with 21 years of legal experience working with complex contracts in a broad area of the law, including but not

limited [to] Finance and IT, when Sears hired her as a 'Senior Counsel' in 2005." (Resp. at 1.) Willis believes in effect that these qualifications are so strong that Sears could not have rationally viewed her as the lowest performer in the group. However, these qualifications by themselves have only marginal relevance given the facts of this case. Sears made its decision after observing her work for over three years. Whatever qualifications Willis may have had on paper at the time she was hired would fade in light of actual, observed on-the-job performance. *See King v. Acosta Sales and Marketing, Inc.*, 678 F.3d 470, 474 (7th Cir. 2012) (noting that education and experience are helpful for getting a job initially but "after that, performance on the job" becomes more important).

Second, and related to the first assertion, Willis argues that the attorney who hired her (Tim Hickey) made a promise that she would be promoted to Assistant General Counsel when an employee currently in that position left. Although Willis repeatedly mentions this alleged promise, she acknowledges that she is not asserting a direct, contract-type claim based on an unfulfilled promise. (Pl. Resp. at 9.) Instead, she is merely relying on this alleged promise by Hickey as indirect evidence of her qualifications. Her reasoning appears to be that, if Hickey was willing to promise her a promotion, he must have believed she was highly qualified. This argument suffers from the same flaws as the first. Hickey's initial opinion was made in 2005 at the time Willis was hired. There is no evidence anyone else at Sears knew of this promise at the time. Hickey was not involved the 2009 decision to lay plaintiff off. That decision was made by others (Hansen and Harker) who were not around when plaintiff was hired.[2]

Turning back to arguments regarding the reasons behind the lay-off decision, we begin with the question of who made the decision. The parties disagree on this question. According to Sears, it was Charles Hansen, and William Harker's only participation was to tell Hansen to choose the person Hansen thought was the lowest performer on his team. (Def. Ex. I at 86.) Willis advances a theory that Harker was directing the outcome behind the scenes and portrays Hansen as a reluctant foot soldier. Willis asserts that Hansen "was not critical of [her] work at any time whatsoever" and that "he never wrote anything up or discussed any deficiencies with [her] at any time." (Pl. Resp. to DF 70.) Willis claims that Hansen did not want to fire her. But there is simply no concrete evidence to support this theory. In Hansen's deposition, Willis' counsel tried to get Hansen to say that Harker was "involved in the final decision" to lay off Willis, but Hansen answered that it was his decision. (Pl. Marked Ex. H at 94-95; *see also* Def. Ex. I at 86, 91.) Willis has not provided any evidence to rebut this testimony.

---

[2] In 2007, in response to an email by Willis about this issue, Hickey stated that he never promised Willis a promotion and also that he did not believe her performance merited one. (Pl. Ex. B; 5/21/07 Hickey Email to Gibron and Myren, ("Based on Jill's level of performance while I was her manager, I would not have put her in for an Asst GC position.").) On summary judgment, however, we will credit plaintiff's version of events and assume that Hickey did make such a promise.

In addition, Willis has not provided evidence to support her theory that Hansen secretly did not want to fire her and only did so based on pressure from Harker. It is true that Hansen did not relish the idea of laying off Willis. When asked whether he had anything personal against her, Hansen replied:

> No. Actually, I really liked Jill. And this whole process was painful for me. Not as painful as for her. But I didn't enjoy what I had to do.

(Def. Ex. I at 103.) It also seems true – based on both Willis' and Hansen's testimony – that they got along. As Willis stated in her affidavit, they had a "good and respectful relationship." (Pl. Aff. ¶ 31.)

Rather than supporting Willis' theory of the case, these facts just add credibility to Hansen's conclusion that Willis was the lowest performer. They suggest that he had no animosity towards Willis, nor any desire to get rid of her, nor any prejudice against her. As for his assessment of her work, it is clear that Hansen investigated and analyzed the issue before reaching his decision. He stated generally that "based on a number of factors that Jill was the lowest performer on my team, period." (Def. Ex. I at 76.) He stated specifically that he had reviewed vendor agreements Willis worked on and was "unhappy with the quality of the drafting." (*Id.* at 41.) Hansen made clear that his assessment of Willis and the other attorneys being considered for the lay-off was based on reviewing their contract drafting. Hansen would periodically review an employee's contract drafting, as a type of spot-check on the quality of their work. He would also review the important contracts and also those where the attorneys raised a question. (*Id.* at 102-03.) In sum, Hansen provided credible and specific testimony about why he made the decision. For Willis to prevail, she would have to (among other things) convince a jury that Hansen lied repeatedly in his deposition. Given her previously-stated position that she had a good and respectful relationship with him, this would be a tall order.

Willis' other main argument is that Harker "manipulated" her performance ratings to get the outcome he wanted. (Resp. at 6-9.) Willis believes that during the annual performance rating calibration process, in which Harker and the other managers compared and harmonized the initial ratings of all the employees across different working groups, Harker supposedly intervened and directed that Willis' scores be lowered because he wanted to get rid of dark-skinned African Americans. Willis has no evidence to support this speculative theory. We have read Harker's deposition testimony and, contrary to Willis' assertion, Harker did not admit to "manipulating" her score. It is true that Harker and the managers went through a calibration process, as they always do, but Willis has not pointed to any evidence from anyone involved in the calibration process that her score was in fact lowered. The only evidence bearing directly on this issue is from Willis' direct supervisor, David Chameli. He testified that the initial score he gave Willis *before* the 2007 calibration process was the same score she had *after* the calibration process was completed. (Reply at 10; Chameli Dep. at 97.) This testimony directly rebuts her theory. For all these reasons, we conclude that no reasonable jury could find that Sears's explanation for laying off Willis was a pretextual lie to cover up discrimination.

Willis' other main claim is under the Equal Pay Act, 29 U.S.C. § 206(d). She alleges that she was paid less than comparable male employees. In her response brief, Willis focuses only on the pay differential between her and Peter DeBruin, who also held the position of Senior Counsel.

Sears does not argue that Willis has not met the *prima facie* elements of her claim. Instead, it argues that summary judgment should be granted because it is undisputed that there are multiple factors other than gender to justify the pay differential between Willis and DeBruin. These factors, according to Sears, are the marketplace value of the skills being sought and DeBruin's prior salary. (Def. Reply at 11; *citing Wernsing v. Dep't of Human Services.*, 427 F.3d 466, 468-71 (7th Cir. 2005).)

Sears has set forth facts and evidence to support why it paid DeBruin at the higher end of the pay scale. When it hired DeBruin in 2006, Sears was looking for someone with a strong background in drafting Information Technology contracts. (DF 23.) DeBruin had worked for Sun Microsystems, a major software company, and he had experience that was not easy to come by, a fact Willis does not dispute. (DF 25.) DeBruin had 15 years of drafting and negotiating IT contracts. (DF 24.) At Sun Microsystems, he was being paid a higher salary than what Sears could offer even after Sears paid him at the higher range for a Senior Counsel. (DF 27.) Sears believed, and Willis does not dispute, that the Sears' Law Department had a significant need for someone with the skills that DeBruin had and that these types of applicants were not readily available. (DF 27.) Also, Sears points out that, in 2008, which was the last full year of Willis' employment, she earned more in salary than nine of the male Senior Counsel then working. (DF 28.) Only two men at that level earned more than her. (*Id.*)

Willis does not dispute these facts, which together provide several legitimate explanations for the pay differential. Her only argument is to note that she had 10 years of complex IT contract experience. However, DeBruin had 5 more years of experience in this area, and he also worked for a major software company. Moreover, as Sears points out, Willis was hired a year earlier for a general contracts position and was not hired specifically for IT work. (Def. Reply at 12.) In sum, based on the undisputed facts above, we find that Willis has not come forward with evidence that would allow a reasonable fact-finder to conclude that Sears' "explanations [for DeBruin's higher pay] are smokescreens." *King v. Acosta Sales and Marketing, Inc.*, 678 F.3d 470, 474 (7th Cir. 2012).

As for Willis' remaining claims, as noted above, she offered no or only conclusory argument for them in her response brief. For example, Sears in its opening brief argued that plaintiff's Title VII and ADEA promotion claims are time-barred. (Def. Mem. at 4.) Willis' response brief only contains a conclusory sentence (at p. 10) that does not directly respond to this argument. Willis does not even mention her retaliation claim at all in her response brief. Her response brief is 12 and a half pages. The Court's page limitation, which can be extended upon reasonable request, is 15 pages. Therefore, this was not a case where counsel lacked the opportunity to set forth all her arguments and supporting case law. We therefore conclude that these remaining claims and arguments have been waived. *See Hess v. Kanoski & Assocs.*, 668

F.3d 446, 455 (7th Cir.2012) ("The district court properly disposed of the remaining counts because they lacked adequate development or support. This court has repeatedly explained that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'"). We agree with Willis' counsel's decision to focus on the two claims above as those were the best arguments; the remaining claims were not as strong for the reasons more fully explained in defendant's opening and reply briefs.

## Conclusion

For all the above reasons, this Court grants summary judgment to defendant Sears on all of plaintiff's claims.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** September 25, 2013